JONES, Justice.
In 1978, the limited partnership of Sky-land Hills, Ltd. (“Skyland”), was formed for the purpose of developing the McConnell Hills Apartments (low-income housing for the elderly) in Tuscaloosa, Alabama. Skyland's two general partners were Gordon Sorrell, a Huntsville realtor, and Hawkeye, Inc., a corporation controlled by Robert C. Morrow, a developer of low-income housing. Hawkeye constructed the McConnell Hills Apartments and was paid a construction fee by Skyland. After the completion of the McConnell Hills construction, and in accordance with the provisions of the documents creating Skyland, Hawk-eye withdrew as a general partner and was replaced by Southern Housing Partnerships (“SHP”), a corporation owned and controlled by Sorrell. SHP became the general managing partner of Skyland.
The McConnell Hills Apartments were financed by the sale of $2,430,000 in revenue bonds, issued and sold by the Tuscaloosa Housing Development Corporation *997 (“THDC”)[1] and secured by a trust indenture, executed on May 1, 1978, from THDC to the First Alabama Bank of Tuscaloosa (“Trustee”). Contemporaneously with its executing the indenture agreement, Sky-land, as owner of the McConnell Hills Apartments, executed a note and mortgage[2] to THDC, evidencing a loan by THDC of the proceeds of the bond sale to Skyland. The note and mortgage were assigned to the Trustee to secure payment of the bonds, as required by the terms of the indenture agreement.
The mortgage contains the following provision:
“And Grantor [Skyland] also agrees that, unless the written consent of Grantee [Trustee, as assignee of THDC] is first obtained, except for the initial sale of interests in the Grantor, (a) the property or any part thereof or interest therein shall not be leased, or sold or disposed of by land contract or otherwise; (b) no other party shall in any manner be permitted or allowed to make or agree to make the payments required on the indebtedness secured hereby; (c) all or any part of the beneficial or equitable interest in the property or any part thereof shall not in any way be encumbered, sold, transferred or disposed of, whether or not any such conveyance be subordinate to the lien of this Mortgage; and (d) any corporation or entity now or hereafter obligated under this Mortgage or the indebtedness secured hereby shall not cease to exist, be a party to any merger or consolidation, nor shall all or substantially all of the controlling interest of suck entity or the stock of any such corporation be transferred; and should any of the foregoing occur without such written consent of Grantee, then at the option of Grantee, and without notice, all sums owing upon this Mortgage and the note secured hereby shall at once become due and payable, anything in this Mortgage or the aforesaid note to the contrary notwithstanding.” (Emphasis supplied.)
The mortgage also limits the collection rights of the grantee/assignee (Trustee, First Alabama Bank) to the value of the McConnell Hills property itself:
“ANYTHING HEREIN TO THE CONTRARY NOTWITHSTANDING, Grantor [Skyland] shall not have any personal liability under this Mortgage or any note or notes secured hereby.... By accepting this Mortgage and recording the same, Grantee [Trustee] agrees for itself and its successors and assigns, that no personal judgment, order or decree against the Grantor will be sought for any failure to comply with any of the terms, provisions or covenants in this Mortgage.”
Section 19 of the indenture agreement also prohibits personal recourse of liability. Additionally, Section 9 of the indenture agreement provided that, in the event of a default of the terms of the note/mortgage, 1) the holder of at least 25% of the total principal amount of the bonds outstanding was entitled to direct the Trustee to declare the principal of all of the outstanding bonds, and the interest accrued thereon, to be due and payable immediately; and 2) the holder of a majority of the bonds outstanding was entitled to direct the Trustee to sell the property and take such further action as was necessary to provide for full and immediate payment of the principal of and interest on the bonds.
In January 1983, Sorrell, who owned all the stock of SHP, sold the SHP stock to Dalcor, a corporation owned by three individuals. Therefore, control of SHP, the managing general partner of Skyland, went to Dalcor. Sorrell remained a general partner in Skyland, and the limited partners in Skyland continued to own 85% of the Sky-land stock. Sorrell and the owners of Dal-cor testified that the sale of the SHP stock to Dalcor had been made so that Sorrell *998 could take advantage of a special capital gains tax treatment.
Morrow Realty Company, another company controlled by Robert Morrow, managed the McConnell Hills Apartments from the project’s inception and was paid a management fee for its services. The management contract gave Morrow Realty Company virtually perpetual management of the McConnell Hills project,[3] and was executed in 1978 (when Skyland Hills was formed) and again in 1981 (when Hawkeye withdrew as a general partner).
By a letter dated April 22, 1983, Skyland notified Morrow Realty of Skyland’s intention to terminate the management services of Morrow Realty Company at McConnell Hills. Morrow Realty sued Skyland (circuit court docket number CV-83-239), challenging Skyland’s authority to terminate Morrow Realty Company as the project’s managing agent based on the terms of the management contract.
In July 1983, the parties and the Trustee became aware of Sorrell’s sale of the SHP stock to Dalcor from information obtained during the discovery proceedings in CV-83-239. The Trustee petitioned the trial court to allow it to intervene. In its inter-venor's complaint, the Trustee alleged that the sale of the SHP stock to Dalcor had taken place without the Trustee’s consent and in violation of the mortgage executed by Skyland. The Trustee went on to state that it believed that a default had occurred, and requested a declaration by the trial court of whether a default had indeed occurred.
On October 12, 1984, Morrow Realty notified the lawyers for the defendants in CV-83-239 that Morrow Realty was ready to end the litigation by executing a release in favor of the defendants. On October 16, 1984, while the Morrow Realty lawsuit against Skyland Hills was still pending, Morrow purchased $1,490,000 of the McConnell Hills revenue bonds. The amount of bonds purchased by Morrow represented a majority of the bonds then outstanding and at the time of the trial of the instant case represented a ¾ majority of the bonds then outstanding. Thirteen days after Morrow purchased the majority of the McConnell Hills revenue bonds, Morrow Realty Company executed a release in favor of Skyland to end the litigation in CV-83-239 regarding the termination of Morrow Realty as managing agent of the McConnell Hills project.[4] The release read, in pertinent part:
“Whereas the parties hereto wish to settle all claims arising out of, or in any way connected with, said civil action number CV-83-239, or the injunction issued therein, or arising between the parties in connection with the McConnell Hills Housing Project ... and to exchange this mutual release of all such claims, ... now, therefore, ... first parties hereby release ... second parties of and from any and all claims or demands of whatsoever kind or nature including without limitation all asserted or unas-serted claims of the first parties against the second parties concerning McConnell Hills Housing Project_”
Having acquired a majority of the McConnell Hills revenue bonds, Morrow made a written demand upon the Trustee, pursuant to the terms of the indenture agreement, asking that the Trustee declare the principal and interest due on the bonds payable immediately. Morrow alleged that Sorrell’s sale of the SHP stock constituted a default under the above-quoted provisions of the mortgage. The Trustee responded that it would decide how to proceed only after obtaining instructions from a court.
*999 Morrow, therefore, filed suit for a judgment declaring that the January 1983 sale of SHP stock by Sorrell to Dalcor constituted a default under the mortgage which, in turn, triggered Morrow’s right to demand acceleration of the indebtedness on the bonds. In support of his contention of default, Morrow stated 1) that the sale of Sorrell’s SHP stock to Dalcor was an unauthorized conveyance of the controlling interest of SHP — the managing partner of Skyland and, therefore, a party obligated under the mortgage; and 2) that the sale of the SHP stock to Dalcor constituted a conveyance of a controlling interest in Skyland itself, because SHP, as managing general partner, controlled the business and affairs of Skyland.
Morrow asked that the trial court require that the Trustee declare the principal of, and the accrued interest on, the bonds immediately due and payable, and that the Trustee sell the property in accordance with Section 9.02 of the indenture agreement. Morrow also requested a mandatory injunction ordering the Trustee to fulfill the requests for relief. Morrow named as defendants in the declaratory judgment action the Trustee, Skyland, and THDC.
The Trustee filed its answer to Morrow’s complaint, a counterclaim against Morrow, and a cross-claim against Skyland. The Trustee requested 1) an order of the court setting out instructions as to the Trustee’s duties under the trust indenture; 2) an order determining whether there had been an act of default requiring acceleration and, if so, whether the Trustee should declare default, accelerate the note, foreclose on the security, or take other action; 3) instructions from the court as to the disposition of a surplus of $149,203.95 (an amount kept under the funding requirements for the bond issue which had been demanded by Skyland); 4) instructions from the court as to whether to release monies from the “extraordinary maintenance and replacement fund” for expenditures; 5) instructions from the court about a prospective sale of the project to a third party; and 6) an award of attorney fees.
THDC also filed an answer in which it admitted the majority of Morrow’s factual statements but denied that the events constituted a default under the terms of the mortgage or the indenture agreement. Both the Trustee and THDC raised the affirmative defenses of violation of fiduciary duty, absence of clean hands, waiver (by the Trustee; and by Morrow, because the act which Morrow contended was a default occurred before Morrow purchased the bonds and, therefore, Morrow purchased the bonds with full knowledge of the event), laches, estoppel, and release (because, in October 1984, after Morrow purchased the bonds, he executed a release in favor of Skyland).
Skyland answered the complaint and the cross-claim filed against it by the Trustee and raised the defense that the Trustee, due to its prior conduct, had unclean hands and was not entitled to relief. Skyland also filed a cross-claim against the Trustee and a counterclaim against Morrow.
Morrow, THDC, and Skyland all filed motions for summary judgment. On January 22, 1986, the trial court entered a partial summary judgment, finding that “Sor-rell’s sale of controlling interest in [SHP] to Dalcor without the required prior consent constituted a default.” Although the trial court’s order decided this one issue of the several issues raised, the order was not certified as a final judgment.
Morrow then amended his complaint and alleged that a controlling interest in SHP and Dalcor had been conveyed to two individuals (the buyer was actually a company owned by two individuals) and that that, too, constituted a default and entitled Morrow to a declaration of default, acceleration of the indebtedness, sale of the property, and issuance of a mandatory injunction. Morrow moved for summary judgment on his latest claims, and the Trustee moved for summary judgment on its claim for attorney fees. Skyland and THDC moved for summary judgment on the claim that Morrow had not complied with the requirements of the indenture because Morrow had failed to provide indemnity when filing suit.
*1000 On October 15, 1986, the trial court entered another partial summary judgment, ordering that Morrow file proof of indemnity before the case would proceed. Morrow complied with the court’s order. On March 20, 1987, the trial court entered an order denying all aspects of all pending summary judgment motions. After a non-jury hearing in August 1987, the trial court entered a final judgment on December 28,1987, one portion of which made final the earlier partial summary judgment, which held that a default had occurred when Sorrell sold the controlling interest in SHP to Dalcor. The final judgment, therefore, held:
1. The sale of the controlling interest in SHP to Dalcor without the required prior consent of the Trustee constituted a default under the terms of the mortgage.
2. The subsequent sale of Dalcor’s stock to the company owned by the two individuals was not an event of default.
3. By executing a general release in favor of Skyland after acquiring the bonds and with full knowledge of the alleged event of default, Morrow released his right to demand that the Trustee accelerate the payment of the bond issue based on the alleged default.
4. An attorney fee was due to be paid to the Trustee’s lawyers from the trust fund.
5. The default had not been waived.
6. The Trustee had the option to accelerate the bond issue or not, solely at its discretion.
The trial court did not address the issues relating to the asserted defense of estop-pel. Skyland and THDC applied for and were granted a stay of execution of the judgment; therefore, the Trustee was prevented from accelerating the payment of the bond issue note pending the disposition of an appeal.
Skyland, THDC, and Morrow have appealed from the final judgment. Skyland and THDC argue, primarily, that a default did not occur when the SHP stock was sold to Dalcor and, thus, that there was no event that required the Trustee to accelerate the repayment of the revenue bond indebtedness. Morrow contends that the trial court erred in holding that Morrow was barred from obtaining the declaratory and injunctive relief he sought by his execution of the release to Skyland. Morrow also argues that the trial court should have held that, in addition to the initial default when the SHP stock was sold to Dalcor, a default occurred when Dalcor was sold. We agree with the assertions of Skyland and THDC, but we can not agree with Morrow’s arguments; therefore, we affirm the judgment in part and reverse in part, and we remand the cause to the trial court.
Appellants Skyland and THDC represent a position contrary to that taken by appellant Morrow. Neither do all appellees share the same position. Therefore, for the sake of clarity, we will address the issues on appeal in the order in which they are listed above as the holdings of the trial court.

I. The Occurrence of a Default

Skyland and THDC contend that the trial court erred in holding that the sale of the controlling interest in SHP to Dalcor without the prior consent of the Trustee constituted a default under the terms of the mortgage. We agree.
Determining whether there has been a default that would allow acceleration of the repayment of the bond indebtedness depends upon an understanding of the provisions of the relevant financing documents upon which the parties base their contentions of default or absence of default. Specifically, we look to the mortgage and indenture agreements for the definition of the agreed-upon events of default and for the consequences of such events of default.
Under the terms of the mortgage, a default occurs 1) if Skyland fails to make payments on the note indebtedness secured by the mortgage; 2) if Skyland defaults under the terms of a “Housing Assistance Payments” contract; 3) if Skyland bankrupts; or 4) if taxation is imposed against the Trustee’s mortgage income. The evidence shows that none of these events has occurred.
*1001 These paragraphs defining the four events of default under the mortgage are followed by the paragraph (set out in its entirety above) that allow the Trustee, at its option, to declare that “all sums owing upon this Mortgage and the note secured hereby shall at once become due and payable” upon the occurrence of the transfer of the property itself or any interest therein; the payment of any installment of the mortgage payments by any entity other than Skyland; or the transfer of a controlling interest in Skyland or the end of Sky-land’s existence.
The indenture agreement also defines “default” for the purpose of that document. None of the events described in Section 9.01 of the indenture (entitled “Events of Default Defined”) has occurred since the time of its execution, but it is important to note that subsection (c) of that portion of the agreement states that “the Note or the Mortgage shall be in default as provided therein.”
Skyland and THDC argue that the sale of SHP stock is irrelevant to an inquiry into an alleged default because SHP was not a “corporation or entity now or hereafter obligated” under the mortgage; therefore, they argue, the mortgage contains no prohibition against the transfer of “all or substantially all of the controlling interest” in SHP — merely a general partner in Sky-land, the party obligated under the mortgage.
In other words, under the plain language of the mortgage, in order for the sale of the controlling interest in SHP to Dalcor to constitute a default, SHP must be a party obligated under the mortgage. The mortgage securing the repayment of the revenue bonds, however, obligates only the mortgagor, Skyland Hills, Ltd., and a controlling interest in Skyland has never been conveyed. The two general partners in Skyland — Sorrell and, initially, SHP— owned only 5% of that limited partnership, while the limited partners owned the remaining 95% of Skyland.
Our holding that the sale of the controlling interest in SHP to Dalcor did not constitute a default (and, thus, did not trigger any authority to call for an acceleration of the repayment of the bond issue) in the terms of the financing documents in issue here is not without support in the further language of those instruments. Each of the documents contained agreed-upon exculpatory provisions designed to shield the individuals behind the signatories from personal liability and to shield Skyland from any liability outside the security — the value of the real property itself.
This same reasoning applies with equal force in determining that the subsequent sale of Dalcor was not an event of default, and the trial court was correct in so holding.

II. The Effect of the Release

Because of our holding with respect to the default issue, the alternative allegations of error advanced by THDC and Sky-land concerning release have been mooted; thus, we pretermit any discussion of that issue.

III. The Award of Attorney Fees

The bond indenture agreement authorizes the payment of expenses and attorney fees incurred by the Trustee from the McConnell Hills projects’ trust fund, characterizing this as the payment of a “prior lien.” However, the indemnity Morrow filed in this case (at the order of the trial court) provided that Morrow would pay all reasonable attorney fees and expenses [5] incurred by the Trustee as a result of Morrow’s suit if Morrow failed to prevail on all of his asserted claims for relief and if the court failed to order that the payment of such reasonable expenses and fees be made by another defendant in the action or by the funds held by the Trustee.
In his brief to this Court, Morrow contends that neither of the two conditions set out in his indemnity filed with the trial court was met and, therefore, that there is no basis upon which to base an assessment of the Trustee’s expenses and attorney fees against Morrow. We disagree.
*1002 Morrow argues that the case of Peach v. First National Bank of Birmingham, 247 Ala. 463, 25 So.2d 153 (1946), supports his argument that the award of attorney fees in the instant litigation should be paid from the McConnell Hills trust fund. The Peach opinion dealt with a trustee’s petition for directions regarding the income disbursement provisions of a trust instrument created by a will. In addressing the issue whether the trustee's application to a court of equity for directions with regard to the administration of the trust constituted an abandonment of the trust, the Court stated that “in § 188.4 [of Scott on Trusts] it is noted that the trust estate should properly bear the expense of judicial proceedings relating to the administration of trusts, as for example, where the trustee applies to the court for instructions as to his duties or powers.” 247 Ala. at 468, 25 So. at 157. (Emphasis supplied.)
It is important to note here that the “expense of judicial proceedings” in the instant case relates to litigation filed by Morrow to determine his rights, as the majority bondholder, to call for a declaration of default and an acceleration of the repayment of the bond indebtedness. The Trustee made its application to the court for directions in response to Morrow’s claims. We can not say that the instant lawsuit was a judicial proceeding “relating to the administration of trusts.”
Further, we note that the trial court’s judgment, also citing the Peach decision, provides that “the trustee may charge a reasonable attorney's fee against the trust” (emphasis supplied), but does not order either that the Trustee or another party pay the fees and expenses. Additionally, Morrow does not ultimately prevail on his claims for relief. Therefore, there is no reason that Morrow, under the specific terms of the indemnity agreement, may not be ordered to pay the reasonable fees and expenses incurred due to his instigating this lawsuit.

IV. Conclusion

We hold that the sale of the SHP stock to Dalcor and the sale of Dalcor to individuals were not occurrences of default under the terms of the McConnell Hills financing documents. We further hold that by his executing the general release in favor of Skyland Hills, Ltd., in settlement of the earlier litigation Morrow released his right to bring the instant action. Finally, we hold that Morrow, and not the Trustee, is liable for the payment of reasonable expenses and attorney fees according to the terms of Morrow’s indemnity agreement and in light of our holdings herein. Additionally, because our holding denies Morrow the relief he seeks in the declaration of default and acceleration of the bond repayment, we need not address the issue whether the alleged default had been waived or the issue whether it was discretionary with the Trustee to exercise or not exercise its option to accelerate the bond repayment.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and MADDOX, SHORES, ADAMS, STEAGALL and KENNEDY, JJ., concur.

. THDC is a non-profit corporation created by the Tuscaloosa Housing Authority for the purpose of issuing and selling the revenue bonds for the McConnell Hills project.

. The note and mortgage were executed by Sky-land Hills, Ltd., through its two general partners, Gordon Sorrell and Hawkeye, Inc. Morrow, as president of Hawkeye, executed the note and mortgage on behalf of Hawkeye.

. The management contract contained the following renewal provision: "Anything contained herein to the contrary notwithstanding, this agreement shall be automatically renewed for additional two-year terms so long as the agent (Morrow Realty) is approved by HUD to serve as agent on behalf of the Owner without further condition and may not be terminated at the end of any such two-year period without the consent of the agent.”

. On November 5, 1984, the trial court dismissed the Trustee's intervenor's complaint without prejudice. The Trustee took no further action with regard to the alleged default until it filed its answer and cross-claim in the instant suit on February 20, 1985.

. The reasonableness of the Trustee’s expenses and attorney fees was stipulated at trial.